J-S37013-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| QUADEER WISE | : | |
| | : | |
| Appellant | : | No. 2747 EDA 2022 |

Appeal from the Judgment of Sentence Entered October 7, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002701-2020,
MC-51-CR-0005925-2020

BEFORE:  BENDER, P.J.E., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MARCH 07, 2024**

Quadeer Wise, Appellant, appeals from the judgment of sentence of life imprisonment without the possibility of parole, imposed following his convictions for, among other crimes, first-degree murder.  He claims that the trial court interfered with his choice of counsel by going to trial with only one of his two attorneys.  He also raises two evidentiary challenges, and alleges that the trial judge should have granted his request to instruct the jury on third-degree homicide.  After careful review, we affirm.

The trial court cogently summarized the evidence presented at trial as follows:

> On February 3, 2019, at approximately 10:23 p.m., … [Appellant], Quadeer Wise, shot and killed the decedent, Saquan Crawley, in front of the Yummy Yummy Asian Restaurant ("Restaurant") located at 4761 Griscom Street.  The entire incident was captured on surveillance video from multiple cameras located inside and outside of the Restaurant.

Earlier that night, the decedent arrived at the Restaurant at about 8:37 p.m. and remained in the general area around the Restaurant for the next hour-and-a-half. At 10:02 p.m., … [Appellant] drove his child's mother's, Symone Baker's, 2014 Chevy Impala to the Restaurant and parked out front on Griscom Street. After sitting in the vehicle for about ten minutes, … [Appellant] exited the vehicle and walked past the Restaurant around the corner onto Foulkrod Street. After returning about five minutes later, … [Appellant] began pacing on the sidewalk next to the vehicle.

At 10:20 p.m., … [Appellant] opened the driver's side door of the Chevy Impala and retrieved a handgun, which he then placed in the right pocket of his pants. Less than two minutes later, the decedent walked past … [Appellant] on Griscom Street and entered the Restaurant. As the decedent walked by him into the Restaurant, … [Appellant] stared at the decedent and reached for his right pocket, but did not pull out the gun. When the decedent exited the Restaurant about thirty seconds later, … [Appellant] approached the decedent as he stood in front of the Restaurant and appeared to say something to him. After the decedent turned away from him, … [Appellant] pulled the gun from his pocket, walked right up next to the decedent, and began shooting him. [Appellant] fired seven shots in quick succession as he moved away from the decedent. He then fled the scene on foot, leaving the Chevy Impala parked in front of the Restaurant.

. . . .

Seven .40 Smith & Wesson fired cartridge casings ("FCCs") and two projectiles were recovered at the scene. Two of the FCCs were located on the front steps of the Restaurant, while the other five were found on the sidewalk in front of the Restaurant. Each of the FCCs and projectiles were fired from the same firearm, which was never recovered.

Deputy Chief Medical Examiner Dr. Albert Chu determined that the decedent suffered seven gunshot wounds, two of which were fatal. The two fatal gunshot wounds were to the decedent's back, while the remaining gunshot wounds were to his chest, buttocks, hip, and right forearm[,] as well as a graze wound to his left index finger. N.T.[,] 9/28/2022[,] at 69-74.

Trial Court Opinion (TCO), 3/23/23, at 2-4.

Appellant did not file post-sentence motions and timely appealed his judgment of sentence. He complied with the trial court's order to file a concise statement and the court prepared an opinion per Pa.R.A.P. 1925(a). We now address Appellant's four claims.

> 1. Did the trial court abuse its discretion in denying Appellant's request for a continuance of trial because Appellant had retained two attorneys for trial and one of the attorneys, Gary S. Silver, Esquire, was on trial elsewhere and unavailable and Appellant was, therefore, denied his [c]onstitutional right to counsel of his choosing and a new trial should be ordered?
>
> 2. Did the trial court err and cause irreparable harm to Appellant by allowing testimony and inferences relating to Appellant's prior criminality and police contacts over trial counsel's objection and a should [*sic*] new trial be ordered?
>
> 3. Did the trial court err and cause irreparable harm to Appellant by allowing hearsay and lack of personal knowledge testimony from Detective Timothy Bass relating to potential flight by Appellant when Detective Bass testified that Detective Thorsten Lucke thought that Appellant had fled to Atlanta, Georgia and when Appellant was arrested in Philadelphia?
>
> 4. Did the trial court err and deny Appellant his substantive [c]onstitutional right to a trial by jury by denying Appellant's request for a third-degree [m]urder charge and thereby supplanting the jury's role in determining whether or not Appellant may have acted with specific intent to kill?

Appellant's Brief at 4.

Appellant's first claim alleges that the trial court interfered with his right to the assistance of counsel of his choosing. We agree with the trial court that Appellant failed to preserve this issue, although our rationale differs somewhat from the trial court's analysis.

- 3 -

Appellant retained attorneys Richard Giuliani, Esq., and Gary Silver, Esq., to jointly represent him at trial. On September 26, 2022, right before the jury was sworn, the trial judge placed the Commonwealth's plea offer on the record, which Appellant rejected. The trial court then remarked, "Mr. Silver is in another room right now. I have spoken to that judge, and he will send you [*sic*] here. But Mr. Giuliani tells me, he has spoken with you, and Mr. Giuliani is ready to try the case. Is that accurate?" N.T., 9/26/22, at 15. Appellant replied, "Yes." The court responded, "Okay. And we're ready to get started today?" Appellant again replied, "Yes." *Id.* Trial then proceeded with Attorney Giuliani solely representing Appellant. On September 28, 2022, immediately after the Commonwealth rested, the court conducted a colloquy with Appellant regarding his right to testify. The court then stated, "And it was my understanding that Mr. Silver was available to come into the courtroom the last – I think as of yesterday, but you talked with Mr. Giuliani, and you were just not going to have him come into the courtroom; is that correct?" N.T., 9/28/22, at 61. Appellant replied, "Yes." *Id.* Attorney Giuliani did not address Attorney Silver's presence at either juncture.

The trial court opinion states that "Attorney Silver failed to file any motion for a continuance or communicate in any way with judicial staff prior to the scheduled trial date[,]" and that the court "reached out to the judge in Attorney Silver's other case and was informed that Attorney Silver would be sent to this [c]ourt as soon as that case was finished." TCO at 7. The opinion then states that the court "conducted a colloquy to confirm that [Appellant]

- 4 -

was choosing to proceed with trial with Attorney Giuliani alone." *Id.* The trial court concluded that Appellant waived any claim concerning Attorney Silver's presence by failing to personally ask for his presence or a continuance. *Id.* ("[Appellant] exercised his right to counsel of his choosing by deciding to proceed with Attorney Giuliani.").

We add the following to supply context to Appellant's argument. On June 22, 2022, Appellant filed a motion which the docket reflects was captioned "Defense Advance Request for Continuance." This motion is not part of the certified record. However, the trial court opinion states that, on June 10, 2022, "counsel for both parties agreed to continue the trial … rather than have the case possibly be transferred to another judge, if one was available to hear the case on June 21, 2022, when this [c]ourt was able to hear the case a week later on June 27, 2022." *Id.* at 6. The opinion further explains that the June 21, 2022 filing was at Attorney Silver's request, "since he was unavailable on June 27, 2022. The next day, both parties agreed to a trial date of September 26, 2022." *Id.*

Appellant largely focuses on the opinion's reference to a colloquy. He asserts that said colloquy was deficient, as "there was nothing approaching a voluntary waiver of a [c]onstitutional right to counsel." Appellant's Brief at 10. Appellant claims that he was therefore deprived of his right to counsel. *Id.* at 9 ("[T]here was, in effect, a direction to Appellant that he would have to proceed to trial without his attorneys."). He further suggests that the trial court forced him to proceed due to annoyance with Attorney Silver, as he had

requested the postponement in June, selected the September 26th trial date, and then failed to proactively alert the court of his unavailability. *Id.* at 10 ("In its [o]pinion, the trial court continues to justify the violation of Appellant's [c]onstitutional right by blaming Mr. Silver. … The trial court continues to prioritize its calendar over Appellant's [c]onstitutional right to counsel.").

We agree with Appellant's very limited point that any purported "colloquy" was deficient. However, that concession is of no help to Appellant as the trial court's disposition of this claim, notwithstanding the reference to a colloquy, rests on the fact that Appellant did not request to postpone the case due to Attorney Silver's unavailability. Our analysis differs from the trial court in that we determine Attorney Giuliani was Appellant's counsel of choice, and he did not seek a continuance due to co-counsel's unavailability. Thus, Attorney Giuliani waived the issue by failing to ask for a postponement or any other type of remedy.

That Appellant was represented by one of his two retained attorneys forecloses Appellant's arguments that he was deprived of his right to counsel of his choosing. Simultaneously, we do not agree with the trial court that Appellant in his personal capacity waived the issue. Instead, we conclude that Attorney Giuliani waived the issue by failing to request any postponement. In this regard, the trial court did not need to ask on-the-record whether Appellant wished to continue with Attorney Giuliani. The salient point is that Appellant was, in fact, represented by the counsel of his choice. Thus, his citation to **Commonwealth v. Rucker**, 761 A.2d 541 (Pa. 2000), wherein our Supreme

Court awarded a new trial for depriving a defendant of his counsel of choice, is inapt. In that case, Rucker was represented by court-appointed counsel, and "[a]fter four jurors were selected, appointed counsel informed the court that [Rucker] wanted to switch to counsel that had, earlier that day, been privately retained by [Rucker's] family." *Id.* at 542. The private attorney was prepared to try the case as he had worked on it for months in anticipation that Rucker would be able to pay. The trial court refused to let private counsel represent Rucker, nor did the court permit that attorney to serve as co-counsel. Our Supreme Court acknowledged that the Commonwealth—and by extension the trial court—has an interest in proceeding with trials, which must be weighed against the accused's right to counsel of their choosing. The Court concluded that "the present case is not one where granting [Rucker]'s request would have caused an unreasonable delay in trial." *Id.* at 543. The Court explicitly noted that "private counsel … was already completely familiar with the matter[,]" and opined that "[t]he state's interest in swift and efficient administration of justice would not, therefore, have been affected in any way by allowing a change of counsel." *Id.*

This case does not involve a request to substitute counsel. Rather, it involves retained counsel's failure to seek the presence of co-counsel. Presumably, Attorney Giuliani spoke with Appellant about Attorney Silver's unavailability and advised him that he was prepared to try the case by himself. This advice led to the "colloquy" cited by the trial court. We conclude that the colloquy is irrelevant to this claim. Any deficient advice supplied by Attorney

Giuliani regarding his preparedness to try the case by himself would have to be addressed in collateral proceedings. That Appellant indicated he did not personally wish to postpone the case is something that may or may not be relevant to those proceedings, and we express no opinion on that point.

The foregoing analysis also resolves Appellant's suggestion that the postponement history discussed *supra* supplied a motive for the trial court to force him to trial. The trial court may well have taken some action if Attorney Giuliani had sought a postponement or delay. For instance, the record establishes that the trial court spoke with the judge presiding over Attorney Silver's other matter. The other judge may or may not have been amenable to waiting for Attorney Silver to finish that case. Perhaps the judge in the other matter would have postponed or deferred that proceeding, whatever it was. For the foregoing reasons, we conclude that Attorney Giuliani's failure to request relief waived the issue.

Appellant's second issue challenges an evidentiary ruling concerning references by police officers that Appellant was known to them from prior encounters. Appellant claims that these references violated Rule of Evidence 404(b), which forbids the introduction of other arrests or convictions to show a propensity to commit crimes. The rule prohibits introducing this evidence due to "policy, *i.e.*, because of a fear that such evidence is so powerful that the jury might misuse the evidence and convict based solely upon criminal propensity." ***Commonwealth v. Dillon***, 925 A.2d 131, 137 (Pa. 2007). Appellant states: "In the present matter, there was extensive testimony as to

prior police contacts with Appellant."  Appellant's Brief at 12.  He cites three exchanges.  The details of the testimony are critical to our analysis and so we discuss the offending comments as cited by Appellant.

The first exchange cited by Appellant occurred at pages 93 through 97 of the first day of trial testimony.  We first set forth some of the preceding testimony as context.  Officer Michael Kilroy testified that he graduated from the police academy in 2012 and was currently assigned to Philadelphia's 15th District, having transferred there in 2015 from the 35th District.  N.T., 9/26/22, at 86.  He informed the jury that, upon graduation in 2012, he was on foot patrol over approximately a six-block radius.  He explained that he first encountered "[Appellant] and a few of the friends that he had back in those days" while on patrol.  *Id.* at 90.  Officer Kilroy said that "they used to hang out in front of a store … approximately a block away from [a] park."  *Id.* at 90-91.  He stated that he "would see [Appellant] all the time; him and the same friends most of the time."  *Id.* at 91.  Officer Kilroy explained that the group "used to always joke" with him because he smoked, and they would say he "had a smoking problem and stuff like that."  *Id.* at 92.  Officer Kilroy added that "[i]t wasn't anything that I would feel like [was] malice or anything like that.  It was a lot of joking, just speaking to one another."  *Id.*

In 2015, Officer Kilroy said he transferred to the 15th District, where the shooting occurred.  He testified that, about "five months into my transfer[,] … I saw [Appellant] and a few of his friends…."  *Id.*  Officer Kilroy described that the two men had a brief exchange, and Officer Kilroy told Appellant that he

had transferred to that district. Afterwards, Officer Kilroy stated that he would see Appellant while on patrol. The Commonwealth asked, "did you have any other kind of contact with him that really sticks out in your mind?" *Id.* at 93. The officer replied that "Appellant was a victim of a stabbing, and he needed transportation[,] … to be taken down for court." *Id.* at 93-94. The prosecutor then asked about the shooting. Officer Kilroy stated he went to the Yummy Yummy store and reviewed the surveillance video "to see if I could see, you know, who was involved or anything like that…." *Id.* at 95. When he watched the video, he stated he saw Appellant. *Id.* at 97 ("Q. When you watched the video, did you recognize anybody in the video? A. Right away I saw [Appellant] in the video."). He testified that he observed Appellant "walk[] up to the gentleman, who then turns his back, and that's when [Appellant] pulls out the firearm and discharges several times into him." *Id.* Appellant did not object to any of this testimony.

Appellant next cites to page 127 of this transcript, which is the second page of the Commonwealth's redirect of Officer Kilroy. We again begin with some contextual background. On cross-examination, Appellant confirmed with Officer Kilroy that the stabbing and subsequent transport had occurred in 2017, which was "well over a year" before the instant homicide. *Id.* at 125. Appellant then asked, "I just want to be clear, you're not certain[,] prior to February 3, 2019[,] the last time you had seen [Appellant] before then?" *Id.* at 126. Officer Kilroy replied, "I don't know the exact date." *Id.* On re-direct, the Commonwealth asked, "You don't know the exact date that you saw

[Appellant] prior to February 3ʳᵈ. Do you know the range of time…?" *Id.* He replied, "Probably, like, weeks. Maybe a few days. [H]e was at … Griscom and Foulkrod … on a daily basis." *Id.* at 126-27. The Commonwealth then asked, "So you would say that, based on that pattern, within what time frame do you think you would have seen him up to the 3ʳᵈ of February?" *Id.* at 127. Appellant objected, citing no specific ground. The trial court immediately overruled the objection, stating: "No. You raised it. You challenged it. She can clarify." *Id.*

The third and final set of references cited by Appellant occurs at pages 9 through 12 of the transcript from the second day of trial, during the testimony of Officer Sean Quinn, who conducted bike patrol in the 15ᵗʰ District during the preceding eight years. The Commonwealth asked, "Can you explain to the jurors when and how is it that you first came in contact with [Appellant?]" N.T., 9/27/22, at 9. Officer Quinn explained that his patrol area encompasses about a dozen blocks, and includes "generally passing by, clearing corners where people may be hanging out, selling drugs, or just, you know, loitering themselves." *Id.* He said he "would pass by [Appellant] on the corner of Griscom and Foulkrod." *Id.* He testified that he could not put a timeline on when he first met Appellant, but his general practice was to "engage with just about everybody; whether it be someone walking down the street[,] … anybody who I may have arrested who may be involved with corner drug sales or other crimes." *Id.* at 10. He continued:

And if I do know [the person], it can be as simple as, "Hey, how are things? You know, I heard you had an open case. How is that going? How is your probation? How is your family? Did you watch the Eagles game?" Pretty much any – any which way I could to engage with people to … help me gauge what kind of person they were.

*Id.* at 10-11.

Addressing his interactions with Appellant, Officer Quinn remarked that he tended to see him "multiple times throughout the week." *Id.* at 11. He then stated:

It would be multiple times throughout the week. Tend[ed] to be more so in the evening hours. When I would engage in conversation with him, he, at times, told me he was working for sanitation. He would be in a sanitation jumpsuit similar to what the trash guys wear. You know, not knowing him very well personally, I just took him for his word, and he was maybe just hanging with friends after work, kind of just talking a bit. My interactions with him were never anything violent or hostile. They always seemed fairly cordial. And that tends to be how most of the conversations go with -- between me and people on the street out there.

*Id.*

Appellant submits that, contrary to the trial court's ruling, he "did not open the door to anything. The door was extensively already [*sic*] opened by the Commonwealth." Appellant's Brief at 13. He claims that the jury "could only infer guilt and criminal propensity based upon Appellant's extensive contacts with and surveillance by police." *Id.*

We conclude that Appellant has waived this argument by failing to lodge an objection at trial to the admission of testimony. We agree with Appellant's argument that his cross-examination did not "open the door" to the

- 12 -

Commonwealth's eliciting evidence concerning prior contacts, as the Commonwealth had already probed those matters on direct examination. Thus, the scope of Appellant's cross-examination properly included that topic. Appellant, however, failed to object to the Commonwealth's discussing Officer Kilroy's past interactions with Appellant. He could have objected to that line of testimony if he believed that it was inappropriate. Having failed to do so, the issue has been waived. Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Alternatively, even if Appellant had preserved a challenge to the admission of this testimony by raising a single, late objection during the Commonwealth's redirect examination, Appellant would not prevail because none of these references suggested to the jury that the prior interactions were related to criminal behavior. Appellant quotes, *inter alia*, **Commonwealth v. Johnson**, 838 A.2d 663, 680 (Pa. 2003), for the general proposition that "no reference may be made at trial in a criminal case to a defendant's arrest or incarceration for a previous crime…." **Johnson** does not, however, stand for the principle that a police officer's testifying that he or she knows a defendant from working the beat implicitly suggests that the person has been arrested or incarcerated. The clause immediately preceding that quotation states, "With regard to the revelation by the remarks that Johnson was incarcerated…." **Id.** Nothing in the foregoing testimony directly informed the jury that Appellant had ever been arrested, convicted, or incarcerated. Thus,

- 13 -

this case does not implicate Rule 404(b), as the testimony did not amount to the introduction of prior crimes, convictions, or arrests.

Appellant fails to cite a single case in which testimony that an officer is familiar with an individual from their police work was treated as unmistakably conveying to the jury that this is somehow code for prior arrests. We will not presume that jurors make the speculative leap that an officer's familiarity with an individual is necessarily due to criminal investigation as opposed to innocuous explanations. Moreover, the risk of that conclusion was lessened in this case because Officer Kilroy told the jury that he regularly spoke to people in his patrol area. N.T., 9/26/22, at 95 ("I would get to know everybody that was out there all the time; more community-based policing type of stuff."). In fairness, Officer Quinn did testify that he spoke to individuals who were on probation, which could suggest that his interactions with Appellant were of the same type. However, Officer Quinn's comments were simply explaining his practice of speaking to basically anyone in the neighborhood. With respect to Appellant specifically, he stated, "My interactions with him were never anything violent or hostile. They always seemed fairly cordial." N.T., 9/27/22, at 11. He did not state that any of these interactions were related to the criminal justice system. Accordingly, Appellant is not entitled to relief, even if this claim had been preserved.

Appellant's third issue also concerns an evidentiary ruling, issued during the testimony of Detective Timothy Bass, a member of the Fugitive Task Force. An arrest warrant for Appellant was issued the day after the homicide on

February 4, 2019, but he was not arrested until March 4, 2020. The Commonwealth called Detective Bass to discuss the efforts made by the task force to arrest Appellant. As to Appellant's claim, Detective Bass obtained a variety of phone numbers potentially associated with Appellant or his associates, which he turned over to Detective Lucke. N.T., 9/28/22, at 26. Over Appellant's objection, the Commonwealth elicited from Detective Bass that Detective Lucke believed, based on his analysis of phone records, that Appellant was located in another state. *Id.* at 32-33 ("As a result of Detective Lucke's analysis, he did believe that [Appellant] was in the Atlanta, Georgia area or, possibly, North Carolina."). Detective Bass related that this opinion was relayed to him on August 29, 2019, and he again met with Detective Lucke on September 4, 2019, at which time they surveilled an address in Philadelphia.

We agree with the trial court that the Commonwealth did not introduce this statement to prove that Appellant was in Atlanta or North Carolina. Therefore, the statement was not hearsay, which is defined as a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(2). As the trial court explained, the Commonwealth did not offer the statement to establish Appellant's actual whereabouts on August 29, 2019, but rather to explain the efforts made to locate Appellant:

> This [c]ourt properly permitted Detective Bass' testimony about the fact that Detective Lucke believed [Appellant] had fled to Atlanta, Georgia. Detective Bass provided details about the

efforts he and his fellow officers made to locate and arrest [Appellant] following the shooting. After an arrest warrant was issued and [Appellant] could not be located in Philadelphia, Detective Lucke, upon analyzing cell phone data, offered a possible lead that [Appellant] was located in Atlanta, Georgia.

. . . .

[A]n out-of-court statement offered, not for its truth, but to explain the witness's course of conduct, is not hearsay.

Detective Bass' testimony that Detective Lucke believed [Appellant] to be in Atlanta, Georgia was not offered to prove that [Appellant] was, in fact, in Atlanta, Georgia at that time, but to detail the attempts made by Detective Bass and his fellow officers to locate [Appellant] and explain why it took more than a year to arrest [Appellant]. Furthermore, this [c]ourt made certain to inform defense counsel that Detective Lucke was available to be recalled to testify if he wanted to question him about this issue. As Detective Bass' testimony was appropriately admitted, [Appellant]'s claim fails.

TCO at 9-10 (citations omitted).

We agree with this analysis and add the following to address Appellant's argument on appeal. In concluding that this testimony was properly admitted as course-of-conduct evidence, we acknowledge that an unfettered view of the theory is not consistent with basic notions of fairness. For example, imagine an officer's testifying that he was sent to a woman's home because she called 911 and said "my boyfriend beat me tonight, just like he did last week." The Commonwealth could argue that the statement was used not for the truth of the accusations but to explain why the officer went to the home in the first place. However, there is a clear danger that the jury would consider the statement for its truth regardless. Appellant makes a similar argument: that Detective Bass' belief that Detective Lucke's opinion was correct is

indistinguishable from telling the jury that Appellant was, in fact, in Atlanta and therefore avoiding arrest. In other words, viewing this testimony as course-of-conduct testimony permitted the Commonwealth to introduce Detective Lucke's opinion, *i.e.*, that Appellant was on the run, without calling Detective Lucke.

As our Supreme Court explained in **Commonwealth v. Palsa**, 555 A.2d 808 (Pa. 1989), courts should be cautious in admitting out-of-court statements under the course-of-conduct theory. It stated:

> Nevertheless, it cannot be said that every out-of-court statement having bearing upon subsequent police conduct is to be admitted, for there is great risk that, despite cautionary jury instructions, certain types of statements will be considered by the jury as substantive evidence of guilt. Further, the police conduct rule does not open the door to unbounded admission of testimony, for such would nullify an accused's right to cross-examine and confront the witnesses against him.
>
> . . . .
>
> Clearly, there is need for a balance to be struck between avoiding the dangers of hearsay testimony and the need for evidence that explains why police pursued a given course of action. This balancing process is governed by the sound discretion of the trial court, and, as with other evidentiary decisions, the trial court's decision will be upheld on appeal unless there has been an abuse of that discretion.

*Id.* at 811.

The **Palsa** Court found that the balancing tipped in favor of the defendant because the course-of-conduct evidence was highly incriminating. It observed that "[t]he challenged statements in the present case were of a most highly incriminating sort. They contained specific assertions of criminal

conduct by a named accused, and, indeed, were likely understood by the jury as providing proof as to necessary elements of the crime for which [the defendant] was being tried." *Id.* at 811. The Court also examined whether the Commonwealth had an alternative to introducing the statements, stating that "the police easily could have explained the course of their conduct pertaining to the investigation and arrest of [the defendant] … without resorting to the full and explicit statements given by [the witness]. It is the prosecutor's duty to avoid the introduction of out-of-court statements that go beyond what is reasonably necessary to explain police conduct." *Id.*

Applying these principles, we conclude that the trial court did not abuse its discretion. First, Detective Lucke's opinion was not a "highly incriminating" statement, as it had no bearing on any issue in the case beyond whether Appellant was attempting to avoid arrest, which is relevant to consciousness of guilt. In this regard, Appellant does not dispute the other evidence showing that he was avoiding the police and, thus, whether Appellant was in Atlanta, North Carolina, or some other location is not particularly damaging. The essential point is that Detective Bass and his colleagues were following all leads in their efforts to arrest Appellant.

Second, with respect to whether the Commonwealth needed to offer the statements, we agree that the trial court's invitation to let Appellant recall Detective Lucke to explore that issue if he desired constituted an adequate alternative. N.T., 9/28/22, at 32 (trial court's overruling objection; "We can always – we can call [Detective Lucke] back, and you can question him about

it."). To the extent that the jury would naturally consider the statement for its truth without an instruction, this is not a case where the defendant was deprived of his ability to confront the declarant. **See Palsa, supra** at 811 ("[A]n adequate explanation for police conduct could have been provided, while minimizing the introduction of statements made by a person who was not under oath and who was not available for cross-examination.").

Appellant's fourth and final issue claims that the trial court erred in failing to grant his request to have the jury instructed on the elements of third-degree murder. "Pennsylvania retains the common law definition of murder, which is a killing conducted with malice aforethought." **Commonwealth v. Packer**, 168 A.3d 161, 168 (Pa. 2017) (quotation marks and citation omitted). "Third-degree murder is defined as 'all other kinds of murder,' *i.e.*, those committed with malice that are not intentional (first-degree) or committed during the perpetration of a felony (second-degree)." **Id.** (citing 18 Pa.C.S. § 2502(a)-(c)). "Murder of the third degree is a killing done with legal malice but without specific intent to kill." **Commonwealth v. Pitts**, 404 A.2d 1305, 1308 (Pa. 1979). The trial court opined on-the-record "that there was no evidence presented that would suggest that the murder was committed with anything other than the specific intent to kill." N.T., 9/28/22, at 171. The court noted that the video surveillance footage showed that the victim was "shot numerous times at what would be relatively close range." **Id.** Moreover, "the defense here is he wasn't the doer; not that it was a third-degree case." **Id.**

Appellant suggests that a third-degree murder instruction is required in most circumstances when the Commonwealth seeks a first-degree homicide conviction, as a contrary rule of law would usurp the jury's role. Appellant's Brief at 21 ("While it was Appellant's position that he did not do the underlying murder, it was the jury's role to convict on every element beyond a reasonable doubt."). Appellant suggests that the only exception is for cases "involving close range shots to the head." *Id.* Because the victim was killed by gunshots to the torso, Appellant claims that the jury should have decided whether the shooter acted with malice that fell short of a specific intent to kill. Appellant's position is essentially that it was exclusively for the jury to determine whether the intentional acts of pointing the firearm and firing multiple times constituted the specific intent to kill. *See Commonwealth. v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013) (explaining that the "absence of specific intent to kill is not an element of third[-]degree murder; rather, such crime is an intentional act, characterized by malice, that results in death, intended or not").

The trial court's opinion cited *Commonwealth v. Solano*, 906 A.2d 1180 (Pa. 2006), which affirmed the trial court's denial of Solano's request to charge the jury on third-degree murder. There, our Supreme Court said:

> [T]he law is clear that a trial court should not instruct a jury on legal principles which bear no relationship to the evidence presented at trial. *See also Commonwealth v. Browdie*, … 671 A.2d 668 ([Pa.] 1996). In the instant case, the evidence unequivocally established that the victim was intentionally killed after being shot several times at close range. [Solano], himself, raised no claim that the killing was anything other than intentional; rather, he asserted that he was not the shooter, claiming he was in Connecticut at the relevant time.

- 20 -

*Id.* at 1190.

We agree with the trial court that **Solano** is largely on point. As there, Appellant here argued that he was not the shooter. While in **Solano** the evidence admitted to show that the killing was intentional was stronger, as the "assailant stood over [the victim] and shot him several more times" after the victim fell to the ground following an initial volley of gunfire, *id.* at 1184, the surveillance video in this case objectively established that the shooter pulled a gun from his pocket, walked right up to the victim, and then rapidly fired seven bullets. Of the seven wounds inflicted, two were deemed fatal by the medical examiner. We agree with the trial court that this is not a case where the evidence leaves room to determine that the shooter was reckless or lacked the specific intent to kill. *Cf. Commonwealth v. Rodgers*, 456 A.2d 1352, 1354 (Pa. 1983) (concluding that evidence was sufficient to establish specific intent to kill; "The nature of the killing, a shotgun blast to the head at short range, establishes the specific intent to take life."). Moreover, that Appellant defended this case based on mistaken identity further supports the trial court's ruling. Because the legal principles applicable to third-degree homicide have no bearing on this case, **Solano**, **supra**, we agree that the trial court properly declined to instruct the jury on third-degree murder.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/7/2024